**Alfredo KUBA, on behalf of himself and all others similarly situated, Plaintiff–Appellant**

v.

**1–A AGRICULTURAL ASSOCIATION, Defendant–Appellee.**

No. 02–16989.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 1, 2003.

Filed Oct. 19, 2004.

David Blatte, Berkeley, CA, for the plaintiff-appellant.

Charles W. Getz, IV, Office of the Attorney General, State of California, San Francisco, CA, for the defendant-appellee.

Before: LEAVY, PAEZ, and BERZON, Circuit Judges.

BERZON, Circuit Judge.

Alfredo Kuba demonstrates on behalf of animal rights at the Cow Palace ("the Palace") every year, when the circus or the rodeo is playing there. The Palace, a performance facility, located just south of San Francisco, is owned by the State of California and operated by 1–A District Agricultural Association ("the Association").

In 1988, the Board of Directors of the Association adopted a "First Amendment Expression Policy" ("the Policy"), which prohibits individuals from demonstrating outside the Palace except in designated "free expression zones," none of which is near an entrance to the building. Kuba maintains that these "free expression zones" do not allow demonstrators access to patrons of the Palace adequate to allow engaging in conversation or handing out leaflets. He challenged the Policy in federal district court, both facially and as applied to him, as violative of the First Amendment, the Equal Protection and Due Process Clauses of the federal constitution, and the free speech, equal protection, and due process protections of the California Constitution.

Both parties moved for summary judgment. The district court held the Policy a permissible time, place and manner regulation, dismissed Kuba's motion for summary judgment, granted the Association's motion, and dismissed Kuba's complaint with prejudice. Kuba timely appealed. We reverse.

I. *Factual Background*

The 1–A District Agricultural Association is a self-governing governmental entity created by the State of California to

hold fairs and exhibitions and to manage recreational and cultural facilities. Cal. Food & Agric. Code §§ 3851, 3951, 4051. The Association organizes and produces the Grand National Rodeo and Stock Show at the Cow Palace and rents out the arena to private promoters for other events, such as the Ringling Brothers Barnum and Bailey Circus.

The Association adopted its "First Amendment Expression Policy" in 1988, amending it in 1989 and 2002.[1] This Policy defines "demonstration" as:

individual or group display of signs other than specifically allowed herein, picketing, leafleting, collection of signatures or marching and any group activity involving the communication of expression, either orally or by conduct of views and/or grievances, and which has the effect and intent or propensity to express that view or grievance to others. Demonstration does not include one-on-one voluntary discussions, with the exception of oral advocacy within 75 feet from any point along the front entrance and/or in the fire zones; or individuals wearing small buttons less than 3–inches in diameter; or symbolic clothing, which clothing does not include pictures or lettering.

The Policy also provides for the creation of "free expression zones onsite for purposes of demonstrations." Such a zone is defined as "a designated area located onsite as established by the Association's Board of Directors, at which members of the public shall have reasonable access [to visitors to the Cow Palace] for purposes of conducting demonstrations."

Oddly enough, the Policy never explicitly prohibits demonstrating outside the designated free speech areas.[2] However, for a number of reasons, we construe the Policy as if it contained such an outright prohibition. The Policy does state that "no one *utilizing the free expression zone* shall leave said zone for purposes of demonstrating or continuing any activities originated in the free expression zone" (emphasis added). Also, the Association's findings with respect to "on-site demonstrations," *which are included in the Policy,* indicate that the purpose of the Policy is to permit individuals to demonstrate only in free expression zones. If individuals were free to demonstrate anywhere regardless of the designated free expression zones, those zones would hardly accomplish the goals of "balanc[ing] the interest of the demonstrators in being given access to the patrons of the Cow Palace, and the safety of the patrons and prevention of accidents or congestion that could lead to injury," and "balanc[ing] the interests of those who wish to engage in activities under the First Amendment versus the patrons of various events who may

**1.** The 2002 amendments were adopted in October, after Kuba filed suit. These amendments included more types of speech in the definition of "demonstration" and thus subjected more communication activities to regulation. Because Kuba requests only declaratory and injunctive relief, we analyze the Policy as it is now, rather than as it was at the time Kuba filed his complaint.

**2.** While we find the lack of an explicit prohibition on demonstration out-side the free expression zones strange, Kuba has not challenged the policy for vagueness. *See Board of*

*Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 576, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (noting that the vagueness of a resolution construed to ban "expressive activity unrelated to airport-related purposes ... presents serious constitutional difficulty"); *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (stating that a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited"). We therefore do not address the issue.

no[t] wish to receive or participate in that message." In its brief to this court, the Association describes the Policy as "restricting First Amendment activities to free expression zones." Therefore, in effect, if not in so many words, the Policy does prohibit "demonstration" outside of the free expression zones.

In implementing the Policy, the Association created three free expression zones. These zones lie on the perimeter of what is called the "preferred parking lot," the lot located directly in front of the main doors of the arena. Two zones are 10 by 20 feet and one is 16 by 18 feet. The zones are between 200 and 265 feet away from the main entrance doors to the arena.[3]

Zone 1 is located near the main automobile entrance to the Cow Palace from Geneva Avenue. Signs and banners displayed in Zone 1 are visible to people riding in vehicles that enter from Geneva Avenue. This zone is also along the pathway of those who enter the Cow Palace on foot, including individuals who take public transportation to the Palace. According to Kuba's declaration, this zone provides reasonable opportunity to communicate with patrons who do come on foot, but the number of people walking in from Geneva Avenue is very small.

Zone 2 is located at the bottom of a stairway leading to a raised walkway and, eventually, the upper parking lot. While this location places demonstrators in the path of those patrons walking to the arena from the upper lot, Kuba represents that, because the zone is at the bottom of the stairway, these patrons do not see him until they are right next to him; that before he can speak or hand them a leaflet they have already walked past him; and that it is therefore very difficult to communicate with patrons from this zone.

Zone 3 occupies a parking space at the southernmost end of the preferred lot. This zone is also situated across a driveway from parking section A. According to Kuba, only a few of the people who park in parking section A actually pass by Zone 3, and those who do are separated from the demonstrators by barricades and moving cars, making communication "virtually impossible."

The Policy further states that "[o]rganizations or individuals desiring to demonstrate on-site [i.e., within the grounds or parking lot of the Cow Palace, but excluding the main arena and other enclosed facilities] should register with the Association." Furthermore, "[r]egistration will be granted on a first-come, first-served basis."[4]

Finally, under the Policy, anyone wishing to demonstrate within the "enclosed facility" (i.e., the Cow Palace arena and any other enclosed or semi-enclosed building or structure on the site) may rent an exhibit space. However, "[t]he Association maintains the right to assign space within its enclosed facilities ... on a seniority basis and providing first preference to those exhibitors who by subject matter are related to the overall theme or subject of the Association's sponsored or controlled event."

The Policy does not mention any practice of renting parking spaces to exhibi-

**3.** A map of the Cow Palace, the surrounding parking lots, and the designated free expression zones is appended to this opinion.

**4.** This even-handed policy is undercut by a later provision of the Policy, which states: "If a limited public forum event occurs, on-site demonstrating shall be allowed with preference given to organizations or groups with related subject matter to the event." However, Kuba does not appear to challenge the Policy's procedures for granting space within the free expression zones.

tors. The declaration and deposition of Michael Wegher, Chief Executive Officer of the Cow Palace, state, however, that parking spaces in the preferred lot are available for rent on the same basis as exhibit spaces within the arena. Accordingly, as for exhibit spaces, the Association can give first preference to those vendors wishing to rent parking spaces who are "related to the show, i.e., offer products and services which are consistent with the nature of the event." When asked whether the Association would rent a parking space to someone intending to sell T-shirts reading, "Boycott the Rodeo," Wegher responded, "Certainly [it] wouldn't [be] in our best interest to do that, would it? ... I don't think we would allow them to have show merchandise that would do that, neither would we allow them to have offensive, politically incorrect bumper stickers...."

In November 1998, Kuba was prohibited from demonstrating in the walkway to the entrance of the arena. According to Kuba, on the very same day, a radio station representative was allowed to hand out leaflets advertising the radio station directly in front of the arena entrance.

## II. Analysis

### A. Eleventh Amendment Immunity and Federal Jurisdiction

■ The Association claims, in passing, that it is immune from suit under the Eleventh Amendment. *ITSI TV Productions, Inc. v. Agricultural Ass'ns*, 3 F.3d 1289 (9th Cir.1993), holds otherwise. That case held that California's Agricultural Associations were not "arms of the state," and thus were not immune from suit under the Eleventh Amendment. *Id.* at 1294. As Appellee is an Agricultural Association, it is not immune from suit.[5]

We also conclude that the district court properly asserted supplemental jurisdiction over Kuba's claim under the Liberty of Speech Clause of the California Constitution.[6] "Nonfederal claims are part of the same 'case' as federal claims when they derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Trs. of the*

---

5. Appellee also asserts in one sentence in the "Statement of Jurisdiction" section of its brief that the Association is not a "person" for the purposes of 42 U.S.C. § 1983. Such a conclusory statement does not adequately raise an issue for our review. *See* Fed. R.App. P. 28(a)(9)(A) (stating that an appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); Fed. R.App. P. 28(b) (imposing the same requirement on appellees); *Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir.2001) ("Issues raised in a brief which are not supported by argument are deemed abandoned."); *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir.1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."). Our jurisdiction is not dependent on the Association being a "person" amenable to suit under

§ 1983 (although whether Kuba's complaint stated a proper cause of action is so dependent). *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 951 (9th Cir.1999), ("Any non-frivolous assertion of a federal claim suffices to establish federal question jurisdiction, even if that claim is later dismissed on the merits...."). We therefore need not address the question *sua sponte*. *Cf. Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1116 (9th Cir.2004).

6. The federal supplemental jurisdiction statute, 28 U.S.C. § 1367, provides that, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

*Constr. Indus. & Laborers Health & Welfare v. Desert Valley Landscape & Maint., Inc.,* 333 F.3d 923, 925 (9th Cir.2003) (internal quotation marks omitted). Here, the California constitutional claims challenge exactly the same actions as the federal claims. The district court did not err in exerting its supplemental jurisdiction over Kuba's claims under the California Constitution.

### B. First Amendment and California Liberty of Speech Clause Challenges

Kuba appeals both the grant of summary judgment in favor of the Association and the denial of summary judgment in Kuba's favor. We have jurisdiction with regard to both determinations and review both de novo. *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1124 (9th Cir.2002). We must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Delta Sav. Bank v. United States,* 265 F.3d 1017, 1021 (9th Cir.2001).

In his complaint, Kuba challenged, both as it applies to him and on its face, the Association's policy of restricting all demonstration at the Palace to the designated free expression zones. A "facial" challenge alleges that "any enforcement of the ordinance creates an unacceptable risk of the suppression of ideas." *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998). An "as-applied" challenge alleges that the restriction on speech is "unconstitutional as applied to the litigant's particular speech activity, even though the law

may be capable of valid application to others." *Id.* We begin by addressing Kuba's facial challenge.

### 1. Kuba's Facial Challenge Under the California Constitution

Initially, we must determine if the California Constitution provides "independent support" for Kuba's claim. *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042 (9th Cir.1985). If so, we will be able to avoid the determination of any federal constitutional issues and thus abide by the doctrine that federal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available. *Id.*

■ The California Constitution provides protections for speakers in some respects broader than provided by the First Amendment of the Federal Constitution.[7] *See, e.g., Los Angeles Alliance for Survival v. City of Los Angeles,* 22 Cal.4th 352, 93 Cal.Rptr.2d 1, 993 P.2d 334, 341 (2000). The standard under the California Constitution for whether a particular area is a "public forum" is one aspect of constitutional law in which the California Constitution varies from its federal cousin. Under either foundational document, however, "[p]ermissible restrictions on expression in public fora must be content-neutral, be narrowly tailored to serve an important government interest, and leave open ample alternative channels for the communication of the message." *Galvin v. Hay,* 374 F.3d 739, 746 (9th Cir.2004).

#### a. Public Forum

Under California's Liberty of Speech Clause:

7. The California Constitution, Article I, § 2(a) (the "Liberty of Speech Clause"), reads: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.

A law may not restrain or abridge liberty of speech or press." The First Amendment reads, in relevant part: "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const. amend. I.

the "public forum" doctrine is not limited to traditional public forums such as streets, sidewalks, and parks or to sites dedicated to communicative activity such as municipal theaters. Rather, the test under California law is whether the communicative activity is basically incompatible with the normal activity of a particular place at a particular time.

*Carreras*, 768 F.2d at 1045 (internal quotation marks omitted).

In *Carreras*,[8] this court held that the parking areas and pedestrian walkways outside Anaheim Stadium and the exterior walkways of the nearby convention center were public fora. 768 F.2d at 1047. In that case, the "communicative activity" that had been restricted was solicitation of donations by the International Society for Krishna Consciousness of Laguna Beach, Inc. (ISKCON). *Id.* at 1041. We held that the city had offered no evidence that ISKCON's solicitation interfered with the success of the stadium as a business enterprise, and that the "mere annoyance" to patrons of having to respond to ISKCON's attempts to solicit donations did not establish incompatibility. *Id.* at 1046. The exterior of the Anaheim Stadium (including its parking lots and pedestrian walk-ways) and the convention center walkways were therefore "public fora" under the California Constitution.

■ *Carreras* dictates our conclusion here regarding whether the area in question is a public forum. As in the areas involved in *Carreras*, "the public is free to come and go" in the parking lots and on the walkways around the Cow Palace, as

people "travel[ ] over the parking lot and walkways to attend .... events or exhibitions." *Id.* at 1045. Also, "[t]he purposes of the ... locations are very similar—the facilitation of parking and the free flow of pedestrian and vehicular traffic." *Id.*

Further, like the city in *Carreras*, the Association has provided no evidence that Kuba's protest activity (or protest activity generally) is a threat to the financial success of the Palace, or is in any other respect more than a mere annoyance to Cow Palace patrons. "Annoyance and inconvenience, however, are a small price to pay for preservation of our most cherished right." *Id.* at 1046 (quoting *Wirta v. Alameda–Contra Costa Transit Dist.*, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982, 989 (1967)). We hold that protest activity is not inherently incompatible with the activity to which the parking lots and walkways outside the Cow Palace are dedicated, and that those areas are therefore public fora for purposes of California Liberty of Speech Clause analysis.

This holding, however, does not give demonstrators free rein in the Cow Palace. The Association may impose reasonable time, place, and manner restrictions on demonstrators' activities, so long as these restrictions also pass constitutional muster. California's "formulation of the time, place, and manner test was fashioned from a long line of United States Supreme Court cases." *Los Angeles Alliance for Survival*, 93 Cal.Rptr.2d 1, 993 P.2d at 338, n. 7 (internal quotation marks omitted). We therefore apply federal time,

---

8. We note that a subsequent decision by the California Supreme Court abrogated that part of the *Carreras* decision in which we held that, under California law, "singling out for regulation speech that involves soliciting donations" constituted content-based discrimination. *Los Angeles Alliance for Survival*, 93 Cal.Rptr.2d 1, 993 P.2d at 350 (holding that, for purposes of analysis under the Liberty of Speech Clause, "regulations ... that single out the public solicitation of funds for distinct treatment, should not be viewed as content based"). *Los Angeles Alliance for Survival* left untouched *Carreras's* public forum analysis, which is therefore still binding on us.

place and manner standards. *See Savage v. Trammell Crow Co.,* 223 Cal.App.3d 1562, 273 Cal.Rptr. 302, 306 (1990); *see also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("Our cases make clear ... that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech...."); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("[T]he activities of ISKCON, like those of others protected by the First Amendment, are subject to reasonable time, place, and manner restrictions.").

### b. *Time, Place, and Manner Restrictions*

Restrictions on the time, place, or manner of speech are reasonable "provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). "The failure to satisfy any single prong of this test invalidates the requirement." *Grossman v. City of Portland,* 33 F.3d 1200, 1205 (9th Cir.1994).

Kuba does not argue that the Policy is content-based, and, at least on its face, it is not. We therefore begin our inquiry by looking at whether the Association proved its policy was "narrowly tailored" to achieve a "significant governmental interest."

#### i. *Significant Governmental Interest*

The Association asserts that it has a significant governmental interest in preventing traffic congestion and ensuring the safety of pedestrians and drivers alike. These interests are indeed significant, as many cases have recognized. *See, e.g., Heffron,* 452 U.S. at 650, 101 S.Ct. 2559 ("Because the Fair attracts large crowds, ... it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration."); *Foti,* 146 F.3d at 637 (reiterating that the "oft-invoked and well-worn [state] interests of ... promoting traffic and pedestrian safety" are substantial); *Weinberg v. City of Chicago,* 310 F.3d 1029, 1038 (7th Cir.2002) ("There is no doubt the City has a legitimate interest in protecting its citizens and ensuring that its streets and side-walks are safe for everyone. Its interest in maintaining the flow of pedestrian traffic is intertwined with the concern for public safety." (citation omitted)). We follow this long line of cases and hold that the Association's interests in pedestrian and traffic safety, as well as in preventing traffic congestion, are significant.[9]

---

**9.** We note that, while it clears the "significance" threshold, an interest in controlling the flow of traffic at a performance venue is less weighty than, and thus may not justify as restrictive speech restrictions as, for example, securing access to hospitals, *see Hill v. Colorado,* 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); protecting against a terrorist attack, *see Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1227 (9th Cir.1990); or ensuring the physical safety of government officials, *see White House Vigil for the ERA Committee v. Clark,* 746 F.2d 1518, 1532 (D.C.Cir.1984); *see also Bl(a)ck Tea Soc'y v. City of Boston,* 378 F.3d 8, 12 (1st Cir.2004) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *New Alliance Party v. Dinkins,* 743 F.Supp. 1055, 1065 (S.D.N.Y.1990) (asserting a substantial governmental interest in protecting the physical safety of the Mayor of New York and his

As the Seventh Circuit stressed in analyzing a challenge to a restriction on speech outside a public entertainment facility, merely invoking interests in regulating traffic around an exhibit or performance facility is insufficient. *Weinberg*, 310 F.3d at 1038. The government must also show that the proposed communicative activity endangers those interests. *Id.* at 1039.

In *Weinberg*, the Seventh Circuit faced a city ordinance banning peddling within 1,000 feet of the United Center, a sports arena. Like the Association, the City of Chicago justified its ban as necessary to "protect[ ] its citizens and ensur[e] that its streets and sidewalks are safe for everyone." 310 F.3d at 1038. The court recognized that such an interest was substantial. *Id.* at 1040. It held, nonetheless, that the City "ha[d] not appropriately demonstrated that Weinberg or any other peddler creates the problems the City asserts they cause." *Id.* Specifically:

> The City of Chicago has provided no objective evidence that traffic flow on the sidewalk or street is disrupted when Mr. Weinberg sells his book. The City offered no empirical studies, no police records, no reported injuries, nor evidence of any lawsuits filed. The City also fails to explain why there were no disturbances or problems when Weinberg was selling his book during the period prior to enforcement of the ordinance or after the lower court granted the temporary restraining order. Using a speech restrictive blanket with little or no factual justification flies in the face of preserving one of our most cherished rights. As Mr. Weinberg notes, the only evidence the City offered was based

on speculation as to what might happen if booksellers could sell their books and the cumulative effect this might have on pedestrian traffic.

*Id.* at 1039. Because, "[i]n the context of a First Amendment challenge under the narrowly tailored test, the government has the burden of showing that there is evidence supporting its proffered justification," *id.* at 1038, the court held the ordinance unconstitutional. *See also Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir.2000) ("Traditionally and logically, . . . the party seeking to restrict protected speech has the burden of justifying that restriction.").

 The Association here similarly failed to meet its burden of proving that demonstrators handing out leaflets and carrying signs on the parking lots and walkways outside the Cow Palace would cause the congestion and danger to safety the Association alleges. In his deposition, Wegher stated that, other than during the rodeo and the circus, there are only one or two days a year in which even a single demonstrator shows up at the Cow Palace. During the rodeo and circus, Wegher estimated that there was "at least one demonstrator" for only three or four days of the rodeo and two or three days of the circus. Thus, although "the validity of this regulation need not be judged solely by reference to [Kuba's] demonstration," *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 296–97, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), the actual experience at the Cow Palace indicating how many protesters have shown up in the past is pertinent to

family). We note as well that where significant security concerns result in limiting access of the public generally to a particular area, as in *Bl(a)ck Tea Society*, 378 F.3d at 12, the First Amendment/ public forum consider-

ations are quite different than they are where, as here, the demonstrators could be present in the parking lot as long as they were *not* seeking to communicate their ideas.

judging the likely impact of allowing communication activity in the future.

Where, as here, the governmental entity has no basis in the record for expecting more than a handful of protestors to show up, the significance of the state interest in the congestion and safety issues is questionable. Absent some reason to suppose that even a few protestors present these dangers, the Association necessarily has difficulty meeting its burden regarding the significance of its asserted interest. Also bringing into question the significance of the state interest in limiting protestors is the evidence showing that radio stations have given out buttons or promotional material on the walkway and that individuals often sell programs and concessions outside the ticket office. There is no record of harm or safety concerns caused by such activity in the supposedly congested areas. This void in the record belies the Association's claim that a demonstrator handing out leaflets would contribute to the harm alleged.

The Association, via Wegher's declaration, does assert what could be considered a "first hand" account, as opposed to mere speculation, of the problem of congestion. Wegher states that:

> There is simply no space in the fire lanes or the concrete apron in which it would be safe to place ... a zone or series of demonstrators who would remain for any length of time. As mentioned above, the vestibule is used for persons buying tickets, picking up tickets, meeting friends, smoking (outside), waiting for rides, being dropped off from rides, or just watching the proceedings. Some shows have both afternoon and evening performances. There are occasions when the afternoon crowd is exiting the facility while the evening crowd is arriving. This entire area including the fire lane and concrete apron can

become extremely congested as people rapidly move in and out of the facility. Although this declaration supports a conclusion that congestion is already a problem in some outdoor areas surrounding the arena, it does not prove that the addition of a handful of individuals in any of the outdoor areas other than the designated zones would substantially exacerbate the problem.

Wegher also states that the Association "once allowed demonstrators to form a line along the edge of the preferred parking lot at the border of parking Lot A. We did note that a large number of persons entering from parking lot A in large part tried to avoid the demonstrators, and there was some increased congestion and [impediment] to persons trying to reach the front doors because of its activity." This very general statement does not show that "some increased congestion and [impediment]" was anything more than a minor annoyance. Obviously, if there are four more people in an area than there would be otherwise, the area is to that degree more crowded and the passersby are to that degree more impeded, in that they can't stand where the protestors are standing. Wegher's statement concerning "some" increase in congestion is thus a tautology. Without more, we cannot say that the evidence establishes a significant governmental interest in avoiding congestion and protecting the public safety. Yet, there is nothing more. Like the city in *Weinberg*, the Association offers no studies or evidence of actual traffic flow and density. 310 F.3d at 1039.

In sum, we doubt the Association has demonstrated with sufficient precision how Kuba and the handful of other demonstrators would contribute significantly to the congestion and traffic danger if allowed to demonstrate in any area other than the designated free expression zones. After

all, Kuba is not asking to protest in an area that he would otherwise be unable to access; had Kuba attended the rodeo as a spectator rather than a protestor his mere presence also would have contributed "somewhat" to the "congestion and impediment" of the other patrons.

We do not mean to suggest, of course, that the Association could not prevent demonstrations that do prevent patrons of the Cow Palace from entering or leaving the facility, or that interfere with drivers circling the lot for a parking space. Common sense tells us that demonstrators walking in front of moving cars could present a safety problem, as could demonstrators blocking patrons' paths. But ordinary traffic regulation, including prohibiting demonstrators as well as others from blocking cars or impeding pedestrians, responds to those concerns. The undeniable need for traffic regulations, and for enforcement of those regulations, does not demonstrate that there is a significant state interest in banning the protestors entirely except in a few small zones.[10]

### ii. *Narrow Tailoring*

■ Even if we assume the Association did provide sufficient support for its asserted interest in congestion and traffic safety, the Association's free expression zones policy is not adequately narrowly tailored. "[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the govern-

ment's legitimate, content-neutral interests[, but] it need not be the least restrictive or least intrusive means of doing so." *Ward,* 491 U.S. at 798, 109 S.Ct. 2746. Nevertheless, the restriction must (1) "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation," and (2) must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799, 109 S.Ct. 2746 (quotation marks omitted).

■ The Policy certainly furthers the governmental interest in preventing congestion. It would be hard to imagine an exclusion of speakers from a given area that did not meet this interest, at least marginally. Forbidding demonstrators from leaving the free expression zones to do anything but engage in one-on-one conversations, and forbidding even this form of communication within 75 feet of the entrance or within the fire lane, keeps the demonstrators from the most congested areas and thereby results in a bit less congestion in these areas.

Such an exclusion of communicative activity from a large area, however, prevents far more speech than is necessary to achieve the goals of preventing congestion and ensuring pedestrian and driver safety. Common sense, as well as Wegher's declaration, indicate that the entrance to the facility is a bottleneck, prone to extreme congestion. The area the parties desig-

---

**10.** The Association's contention that, as in *Hill,* the patrons of the Cow Palace are a "captive audience," and thus that the Association has a significant interest in protecting them from unpopular speech, is unpersuasive. In *Hill,* the audience at issue consisted of patients entering a medical facility. Here, the intended audience is the patrons of the Cow Palace, a place of public entertainment. Further, in *Hill,* the restriction in question did not "protect a potential listener from hearing a particular message," but only "from the

potential physical and emotional harm suffered when an unwelcome individual delivers a message ... by physically approaching an individual at close range." 530 U.S. at 718–19 n. 25, 120 S.Ct. 2480. Here, the restriction is not limited either to a location where the audience *is* particularly vulnerable, as in *Hill,* or constricted, as in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), or to protection from especially intrusive communication, as in *Hill.*

nate as "the apron"—i.e., the space just in front of the entrance—is 12 feet by 100 feet. Everyone entering or exiting the arena must pass through it. There is no evidence, however, that all areas other than the three free expression zones pose a similar risk of congestion and safety hazard.

Rather, in large parking lots, the likelihood of potential pedestrian congestion throughout is small. Different areas of a parking lot fill to different densities with individuals walking to or from the building. The closer one gets to the entrance, the more crowded the walkways and driveways will be. Such measures as prohibiting protestors within a certain distance from the entrance to the building, or limiting the overall number of demonstrators in certain areas closer to the entrance, or requiring that protestors stand a certain distance from each other, are all measures that directly respond to the nature of congestion and traffic safety issues in parking lots.[11] The present policy, which relegates communication activity to three small, fairly peripheral areas, does not "sufficiently match" the stated interest of preventing congestion, see Grossman, 33 F.3d at 1206–07, and so is not narrowly tailored to serve the government's interest. See In re Hoffman, 67 Cal.2d 845, 64 Cal.Rptr. 97, 434 P.2d 353, 358 (1967) (Traynor, J.) (noting that First Amendment activities can be prohibited in "areas normally subject to congestion, such as ticket windows and turnstiles" and "[p]ersons can be excluded entirely from areas where their presence would threaten personal danger or block the flow of passenger or carrier traffic, such as doorways and loading areas").[12]

The narrow tailoring analysis of *Heffron* is not to the contrary. The regulation in *Heffron* permitted demonstrators to "walk[ ] about the fairgrounds and communicat[e] the organization's views with fair patrons in face-to-face discussions." *Heffron*, 452 U.S. at 643, 101 S.Ct. 2559. At the Cow Palace, these discussions are prohibited within 75 feet of the entrance and within the fire lane. The "fixed locations" in *Heffron* from which demonstrators could "sell, exhibit or distribute materials" were booths rented on a first-come, first-served basis. *Id.* at 643, 101 S.Ct. 2559. At the Cow Palace, while the space in the free expression zones is allotted on a first-come, first-served basis, the Association may give first preference to show-related exhibitors when renting exhibit space.

The physical layout of the State Fair in *Heffron* also bore little resemblance to the parking lots and walkways surrounding the Cow Palace (at least as those lots and walkways are ordinarily used.) One of the main attractions of any fair is the exhibition booths themselves:

> The Fair is designed to exhibit to the public an enormous variety of goods, services, entertainment, and other matters of interest. This is accomplished by confining individual exhibitors to fixed locations, with the public moving to and among the booths or other attractions, using streets and open spaces provided for that purpose.

---

11. As the Association has not adopted any such limited restriction, the constitutionality of restrictions of one or more of these varieties, singly or in combination, is not before us.

12. Pointing out alternatives that are "far less restrictive and more precise" means of regulating the time, place, and manner of speech is not the same as imposing a "least restric-tive means requirement." *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir. 1991). Rather, figuring out that there are a number of obvious alternatives is the first step in any "narrow tailoring" analysis; consideration of whether the alternatives both are feasible and allow substantially more speech follows.

*Id.* at 650, 101 S.Ct. 2559. The organization and physical layout of the Minnesota State Fair therefore encourage milling about rather than purposeful movement toward a single central location, and features narrow passageways rather than broad open lots. Because the fairgrounds as a whole were the destination of the Fair's patrons, most if not all of the areas would be equally congested.

Further, the number of visitors and exhibitors at the Minnesota State Fair (1,400 exhibitors and concessionaires in 1977 and 1978 and average daily attendance of between 115,000 and 160,000, *id.* at 643, 101 S.Ct. 2559) was vastly greater than the number of visitors and exhibitors at the Cow Palace.[13] Thus, the problems of crowd control on the fairgrounds were serious and continuous, and were spread equally throughout the exhibition area.

In contrast, the Cow Palace parking lots are not stopping places for patrons, nor are patrons restricted to relatively narrow pathways in traversing the lots. Rather, as the record establishes, patrons generally do not use the walkways as they pass through the large parking lots on their way into the arena, instead walking as they please among the cars and along the driveway. The congestion in a parking lot is not consistently serious throughout space or time, and in fact is predictably more congested the closer one is to the entrance, and less congested the farther out one is in the lots. The Association's restriction, which limits even those demonstrators in the less crowded areas to the small, circumscribed "zones," does not take this into account, and therefore restricts substantially more speech than necessary to address any congestion and traffic problems near the Cow Palace.

Moreover, while at the Fair the booths available for distribution of literature "are located within the area of the fairgrounds where visitors are expected, and indeed encouraged, to pass," *Heffron*, 452 U.S. at 655 n. 16, 101 S.Ct. 2559, at the Cow Palace patrons are not "encouraged" to pass by the few areas in which free expression is allowed. Cordoning protestors off in a free expression zone the size of a parking space, located over 200 feet from the entrance, far from encouraging interaction with them, is more likely to give the impression to passers by that these are people to be avoided.

We conclude that the Association's Policy burdens speech substantially more than did the policy in *Heffron*, and substantially more than is necessary to further the Association's legitimate interests. The Policy is therefore unconstitutional even if the governmental interests furthered are sufficiently weighty to pass muster. Because the Policy fails the "narrow tailoring" requirement of our analysis, we need not address whether ample alternative channels for communication exist. *See Grossman*, 33 F.3d at 1205.

Having determined that the Policy unconstitutionally restricts Kuba's free speech rights under the California Constitution, we do not reach Kuba's as-applied challenge or equal protection claim.

III. *Conclusion*

The First Amendment Expression Policy enforced by the Association at the Cow Palace during the rodeo and the circus is unconstitutional on its face. Because the district court erred in granting summary judgment to the Association, and also erred in denying Kuba's summary judgment motion, we reverse.

---

**13.** According to Wegher, only a few exhibitors rented parking spaces. Average daily attendance during the rodeo and circus is roughly 10,000.