PAEZ, Circuit Judge,
concurring and dissenting:
I concur in the majority’s holding that Seattle’s Civil Emergency Order Number 3 (Order No. 3) was content-neutral and served a significant government interest. I cannot agree, however, that Order No. 3 was narrowly tailored and left open ample alternative channels of communication. I also disagree with the majority’s determination that Order No. 3 provided adequate guidance to the law enforcement officers who were assigned the task of maintaining the perimeter of the “No Protest Zone.”[1] Accordingly, I respectfully dissent from *1159 Parts III.A.2-3 and III.B of the majority’s opinion.
Assuming that Order No. 3 had been a valid time, place, and manner restriction on protected speech, I agree with the majority that the Hcmkin class action plaintiffs have raised material triable issues of fact regarding their claim that City officials enforced Order No. 3 to suppress the First Amendment speech of those individuals who sought to protest the World Trade Organization’s policies. The Rankin class action plaintiffs should be permitted to proceed with their challenge to the Order as applied, and I therefore concur in Part III.C. of the majority opinion.[2]
The heart of my disagreement with the majority is its conclusion that Order No. 3 was narrowly tailored, that it left ample alternative avenues of expression and that, as implemented, it gave sufficient guidance to law enforcement officers to determine who could be admitted into the No Protest Zone. The majority concludes that the City’s ban on all expressive activity in the 25 square blocks surrounding the WTO convention and hotels that housed WTO delegates passes our searching First Amendment review. I cannot agree, and in my view that conclusion is inconsistent with our long tradition of protecting free speech even when that protection may seem inconvenient.
The majority is correct that our inquiry into the content neutrality of Order No. 3 focuses only on the face of the Order itself. But in evaluating whether Order No. 3 is narrowly tailored and leaves open ample alternative avenues of expression, we look deeper than the text. Instead, “we must consider the [Cityj’s authoritative constructions of the ordinance, including its own implementation and interpretation of it.” Forsyth County v. Nationalist Movement, 505 U.S. 123, 132, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (emphasis added). While the text of Order No. 3 may be content neutral, the City’s policy was to apply the law selectively such that it was not narrowly tailored to serve its asserted non-speech-related interest of preserving safety and order. As the Seattle City Council put it, “while [Order No. -3] might have met legal scrutiny on paper, [it],resulted in actions that were explicitly intended to limit protest.” Report of the WTO Accountability Review Committee, Seattle City Council, at 5 (Sept. 14, 2000) (hereinafter “ARC Report”).
I. Facts
A.
The picture painted in the majority’s version of the events surrounding the WTO convention in Seattle fails to capture the full story. I agree with the majority that the violent protestors created a dangerous, even chaotic situation in Seattle that warranted substantial responsive measures by the City to restore order. The City surely had a significant interest in taking remedial action. Even in light of the serious violence, however, the City’s response — cordoning off a 25-square-block area of downtown Seattle to restrict all forms of protest — was not constitutionally justified.[3] The majority opinion omits *1160 several crucial facts that undermine its portrayal of a city in crisis. First, contrary to the majority’s assumption, Order No. 3 was not justified by “the dire facts confronting the City in the early morning hours of December 1 during the WTO conference.” Maj. op. at 1140. As Assistant Seattle Police Chief Edward Joiner’s deposition testimony made clear, the decision to declare a state of emergency and to impose the police perimeter around the downtown area was not made in direct response to the violence and vandalism. That decision instead followed the realization that many of the peaceful protestors from the large, well-organized labor march would not be leaving Seattle. The crowd was simply larger than the police had anticipated. Joiner testified that
[ a]s the march concluded and it became evident that a sizeable portion of the marchers were not going to leave the downtown area as we anticipated and it became clear that we were not going to be able to bring the situation under control without taking some sort of drastic action, I made the decision that the only — the only recourse we had was to establish the police perimeter where we could provide security for the delegates and so forth.
Making the decision to impose the police perimeter, the City drew no distinction between peaceful protestors and those likely to cause violence — Joiner, for example, testified that during this process, the concept of peaceful and non-peaceful protestors “merged.”
Second, although I do not suggest that the violence confronting the City was insignificant, the majority’s account exaggerates its pervasiveness. The ARC Report, for example, noted that even according to the highest estimates, only “well under one percent” of the demonstrators in Seattle engaged in acts of vandalism or violence. ARC Report at 3. Mayor Paul Schell agreed that he had “expected the vast majority of the protestors to be peaceful, and, in fact, it turned out that the vast majority of protesters were peaceful.” At a press conference at approximately 5:00 p.m. on November 30, Mayor Schell maintained that the protestors for the most part “were friendly — they were our sons and daughters, they were our neighbors, they were the people who we work with. And there’s no reason to be afraid of them.” The peaceful protestors even made efforts to prevent the violence by, for example, blocking vandals from access to store windows they attempted to break.
Further, the majority does not paint a clear picture of the situation confronting City officials at the time they adopted the Order. The violence of November 30 had ended before Order No. 3 was implemented. The nighttime curfew — not challenged here — had gone into effect and the streets of downtown Seattle were calm and under control. On Tuesday night, at roughly 8:00 pm, the police did a sweep of the streets and, according to Joiner’s testimony, discovered that “[a]t that time all of the demonstrators had left. The situation was under control. It was quite peaceful.”[4]
*1161 As the violence on November 30 erupted, the police responded with force that, as the City Council’s report concluded, likely intensified the situation. “As authorities lost control of the streets they resorted to methods that sometimes compromised the civil rights of citizens and often provoked further disturbance.” ARC Report at 3. The police response “was sometimes out of proportion to the threats faced” and included “seemingly gratuitous assaults on civilians.” Id. at 4. Plaintiffs’ expert Robert Klotz, the former Commander of the Special Operations and Traffic Division in the Washington, D.C. police force, concluded that “the state of emergency declared on November 30, 1999 was to a large extent an emergency of the City’s own making.” Klotz continued,
Being seen and heard is why demonstrators come to the event, and if they feel they are barred from doing so, it will simply make the crowd angry and more dangerous. It also makes the police the object of dissatisfaction, rather than the original source of protest. It can also motivate some people to protest police activity who never wanted to be involved originally.
One consequence “was to bring sleepy residents out of their homes and mobilize them as ‘resistors.’ ” ARC Report at 11.
City officials were apprised of the large number of protestors planning on coming to Seattle well in advance of the conference. Klotz stated in his declaration that “[t]he preconference estimates of the size of the crowds were generally consistent with the number of people who actually attended.” At a police training on demonstration management and crowd control that Seattle Police Captain Jim Pugel attended in July 1999, officials “said on a scale of 1 to 10 the WTO rated about a high 8.” Furthermore, the violence that occurred in the weeks leading up to the conference should have put the City on notice that they would need to plan well for the event. See maj. op. at 1120. According to Captain Pugel’s own After Action Report, police officials were aware by at least November 28 — if not earlier — that protest groups were “intent on facilitating between 500 and 1,500 ‘civil disobedience’ arrests” on November 30. They also knew at that time that they had insufficient resources and “that we might not be able to sustain the arrest of so many persons.” There should have been no surprises.
According to the ARC Report, however, “[planning for the WTO was driven by political and cost considerations that undermined the city’s ability to cope with the disorders that ensued.” ARC Report at 8. The Report found that the “city government failed its citizens through careless and naive planning, poor communication of its plans and procedures, confused and indecisive police leadership, and imposition of civil emergency measures in questionable ways.” Id. at 3. Klotz similarly concluded that the City “did not adequately plan or train for the WTO conference,” focusing its attention on highly unlikely events rather than “events that were, according to the available intelligence, quite likely to occur (i.e., organized civil disobedience and some vandalism).”
*1162 B.
The manner in which the City implemented Order No. 3 is also worthy of more searching inquiry than the majority affords. The plaintiffs submitted a great deal of evidence to undermine the City’s claim that Order No. 3 was necessary to contain and prevent the violence of November 30. Notably, the Order allowed anyone who did not visibly display opposition to the WTO to enter the zone, without regard to dangerousness or likelihood of violence. While the police scoured for “No WTO” signs and buttons, there was no evidence that officers checked bags for crowbars, weapons, or bombs. Lauren Holloway, for example, stated in her declaration that the officers she encountered at the perimeter “did not search me for weapons or ask for ID. They were only interested in our signs and stickers, which they either confiscated or forced us to remove.” Andrew Russell recounted a similar experience in his declaration. But this “selective or partial” No Protest Zone did not serve the City’s safety and security interests, as Klotz explained:
[ I]t does not serve security goals to have a supposedly secure area where a very large number of inessential people are allowed to enter and roam at will. By giving a free pass to people who claimed to live, work, or even shop at locations within the zone, the City’s orders allowed a very large number of people into this supposedly secure area.... Serious terrorists or other people bent on breaking the law will have no trouble taking off their anti-WTO stickers at the boundary and pursue their plans once inside the zone.
The plaintiffs also presented significant evidence that even as members of the general public were permitted entry, protestors were turned away from the No Protest Zone. Police Chief Norman Stamper testified that, under the Operations Order that implemented Order No. 3, “a reasonable purpose does not include coming into the area for protests, so I think the language itself gives rise to the claim that this had become a no-protest zone.” At least as late as Friday, December 3, official documents referred to the area as the “ ‘No protest’ zone.” Seattle Police Officer Christopher Myers in his deposition testimony referred to it as “the protest zone. There was where protesters were allowed. There was where protesters weren’t allowed.” And testimony from several protestors reveals that police officers guarding the perimeter used the term “No Protest Zone” when speaking with the public.
Stamper clarified in his deposition that “[f]rom [the line officers’] point of view it effectively meant anybody coming in to protest” would be excluded from the zone. Joiner testified that City officials even considered the idea of allowing in peaceful demonstrators but rejected it, “because I think at that time it had been made very clear there were not going to be peaceful demonstrations within that area.” If a person attempting to enter the zone did so, not for the purpose of shopping, but instead intended, individually, to peacefully protest, “she would not have been allowed in.”
According to the City Council’s report, “officers in the field were briefed with instructions that there would be no protests allowed.” ARC Report at 15. Seattle Police Officer Ron Smith testified that, according to “the briefing [he] was given,” protesting was not a legitimate reason to enter the zone. The State Patrol, one of the cooperating law enforcement agencies, made that policy explicit: its response plan for December 1 stated that “[o]nly people with legitimate business will be allowed to enter, (working in the area, live, etc.) [sic]. Obvious protesters, people *1163 without legitimate business, or people that refuse to give information will not be allowed in the area.” In a televised public address, Joiner warned, “Anyone that goes into that area to protest will be arrested immediately.”
Even those who should have been granted access to the zone according to the plain terms of the Order, such as people who lived or worked in the zone, were denied entry if they wore “No WTO” stickers or carried protest signs. Officer Smith testified that the policy as conveyed to him by the Mayor was that “[e]ven if you live there, you are not supposed to be protesting” because “the protest area is down south of Seneca and west the Fourth [sic]. That’s what the Mayor said.” The plaintiffs offered numerous examples of Seattle police enforcing just such a policy. Michael Louis Evanson, for example, stated in his declaration that while on his way to a tuxedo fitting on 4th Avenue, he was stopped by police officers who snatched his hat and ripped off a sticker that read: “WTO: If it doesn’t work for working families, it doesn’t work.” An officer also reached under Evanson’s poncho without permission, grabbed papers he was holding and would not return them. The papers were invitations to a party at the Methodist Church that had nothing to do with the protest.
Martha Ehman, an attorney who worked within the zone, declared that she passed through the perimeter by following the same route she normally took to walk to work every day. She saw three people in business suits pass through the perimeter without being stopped, but she was dressed casually and officers asked her where she was going. They let her pass when she told them where she worked, but as she walked away the officers yelled for her to stop when they noticed that the words “No WTO” were written in masking tape on her backpack. They asked her to remove it and she refused; they then informed her if she did not remove the tape she would be arrested. To avoid arrest, Ehman did as the officers instructed.
Ronald Matyjas also worked downtown, at his architect office just north of the Pike Place Market. He stated in his declaration that on December 1, he wore his typical work attire “with one difference: I had a[n 8.5 x 11”] sign attached to the back of my raincoat that said “No WTO.” As he was walking to work, he attempted to pass through the perimeter but he was stopped by an officer who asked him why he was walking through the area. Matyjas replied that he was on his way to work. The officer told him he could not go downtown with that sign on his coat; another officer tore the sign off without Matyjas’s permission. Matyjas noted that “[t]he other officers standing nearby did nothing to stop or correct the officers that confronted [him].”
Ehman, Matyjas, and Andrew Russell all stated in their declarations that once they took off their political signs, for the remainder of the week they were not stopped by police. They were only stopped for wearing political messages.
Michael W. Gendler, another Seattle attorney, was a partner at a law office located on the edge of the zone at Fourth Avenue and Pike Street. He declared that he and three of his employees left their office carrying three protest signs which read, respectively, “Downtown Workers Against the WTO,” “Protect Free Speech!,” and “Say No to WTO” with the words “No Sale” imposed over a picture of the globe. When they attempted to enter the zone, police stopped them and refused entry even after Gendler showed the officers his business card and address. Gen-dler cited Order No. 3 and told the officer that he had a right to enter because he was an “owner of a business within the *1164 limited curfew area.” The group was not allowed to enter. Gendler then got rid of his sign and the group walked.one block further to another entrance, where Gen-dler (no longer displaying any anti-WTO messages) simply walked through the perimeter “without being stopped or questioned by any of the officers.” His employees, however, still held their signs and they were stopped by officers who told them “they would not be allowed to proceed because they were attempting to enter a ‘no protest zone.’ ” They again displayed their business cards and again were denied entry. “Both were informed that they could proceed without their signs, but not with them.” They abandoned their signs and proceeded to enter the zone.
In many other cases, police officers simply made no attempt to determine whether or not an individual was authorized to enter the zone once they spotted any anti-WTO protest material. Andrew Russell, for example, was stopped by an officer as he attempted to enter the zone wearing a “No WTO” button. An officer told him that he could not wear his button inside the “No Protest Zone. He used that specific term.” Russell was allowed to enter the zone and keep the button only after removing it from his clothes and putting the button away.
Liad Kantorowicz and her friend Lauren Holloway were stopped by the police at the perimeter. Kantorowicz held a sign and wore three stickers; two “No WTO” stickers and one sticker on her chest which read, “Attention Police Enforcement Officer, I refuse ... to speak to you. I demand to have my phone call. I demand to call a lawyer.” The sticker also included phone numbers of lawyers. An officer noticed Kantorowicz’s sign and asked to take it away. When she refused to give it to the officer, Kantorowicz recounted,
he just grabbed-the sign from me and took it, threw it over his shoulder. And I said, “Can I have my sign back? It’s my property.” Maybe at that point he said, “No. This is a no-protest zone.”
An officer then grabbed Kantorowicz and removed the stickers from her clothing.
Holloway carried a sign that read, “It’s Our Duty, It’s Our Right, To Fight the Power.” She also wore stickers with various WTO-related slogans. When she approached the perimeter, officers grabbed her sign, crumpled it up, and threw it away behind a line of police. They told her and Kantorowicz that they were in the “No Protest Zone” and that they would have to take off every anti-WTO sticker or they would be arrested. When an officer grabbed Holloway’s arm, she told him she would remove the stickers herself “[t]o get him to leave me alone.”
Sue Bastían, a schoolteacher who traveled to downtown Seattle for the WTO protests, recounted, “I was just a little old lady on my way to the Methodist church carrying these signs in a bag, and I was simply walking down the street on my way to the church.” In a bag, she carried one sign that read “Free Trade is Slave Trade” and another that read “Global Cops for Global Corps.” She was outside the police perimeter and she did not believe that she was within the zone established by Order No. 3. Nonetheless, she stated in her declaration that a police officer approached her and blocked her passage,
and then I was surrounded by four or five others. One of them — or somebody took my WTO sticker off my rain jacket. The sticker was underneath my back-back. And one of the police took my signs away from me and looked at them and handed them to another policeman, who took them over onto the sidewalk and broke them.
The officers told her she was not allowed in the zone, refused to return her signs *1165 and told her “if you don’t be quiet and leave, I will have you arrested.”
Rita Herkel had a similar experience on her way to the Methodist Church. At the northeast corner of Fourth and Spring, Herkel and her Mends were waiting for the light to change so they could cross the street when three police officers approached them. Herkel and her .friends were wearing lime green stickers approximately 3 x 5" that read “No to WTO.” The officers said, “You’re not allowed to wear stickers,” and began tearing the stickers off of Herkel’s clothes without permission. They searched her friend’s backpack, also without permission, but did not say what they were looking for. While forcibly removing the stickers from another woman in the group, the officers tore her coat.
Harold Green, an attorney in Seattle, heard on television that a “no protest zone” had been established downtown. As he stated in his declaration, “[t]hat struck me as an unconstitutionally broad edict, so I determined to learn from personal experience what the scope of the edict was.” He wrote the words “I PROTEST!” on the back of one of his business cards and, wearing a suit and tie, approached an officer at the perimeter and
asked politely, “If I ask you a question, will I be subject to arrest?” He said that I would not. I then pulled my business card from my pocket, showed him the side which said “I PROTEST!,” and asked him, “If I were to cross this line and display this card, would I be subject to arrest?”
He immediately responded that I was subject to arrest at that moment. I then asked him, “Am I in a zone where what I am doing is illegal?,” and he repeated that I would be arrested if I did not leave.
I was immediately confronted by two or three other riot police officers with vi-sored helmets and long night sticks who began to shout repeatedly at me, “Go!”, “Just Go!” ... As I did not want to be arrested, I put the card back in my pocket and walked back down (west) Spring Street.
Plaintiff Doug Skove similarly went downtown to protest after hearing a news broadcast describe the zone as a “no protest zone.” He went inside the zone carrying a sign that said “I have the right to protest non-violently.” Skove testified at his deposition that Officer Ron Smith grabbed the sign out of his hand without Skove’s permission, saying “I’m going to take that” before any other communication between the two. Smith told him to come over but Skove instead walked away and was not pursued. This incident was captured on videotape.[5] Officer Smith never ascertained whether Skove was authorized by the Operations Order to be within the zone before tearing the sign away from him. Smith testified in deposition that he determined only that Skove “appeared not to belong there” because “[h]e was walking around with a sign.” Skove then went to the corner of Fifth Avenue and Pike Street and took out a second sign, where another unidentified officer again took the sign from his hands without permission and without any prior verbal exchange.
Other people were stopped by the police while attempting to more actively protest *1166 within the zone, confirming the City policy that protesting was not a “reasonable purpose” within the meaning of the Order. Thomas Sellman, a plaintiff in this appeal, heard on the news that Seattle had adopted a “no protest zone” where people could enter for any reason other than protest. He went downtown “basically to find out what was really meant and whether the broadcasters in some way had accurately described the intent of the Mayor and the City of Seattle.” He walked down the sidewalk, within the zone, and distributed leaflets criticizing the WTO’s ability to overrule endangered species laws. He was stopped by Detective S.D. Stevens, who determined that Sellman’s activity was “obviously” not “legitimate business” within the scope of the Operations Order. Stevens told him he needed to go two blocks south in order to protest. Instead of leaving, Sellman handed one of his flyers to a WTO delegate as he walked by. Stevens then placed Sellman under arrest for failure to disperse.
Plaintiff Todd Stedl went to the zone to hand out copies of the First Amendment; if an officer stopped, him he “planned on saying ‘I’m not protesting; I’m educating.’ ” Stedl testified at his deposition that the officer who first stopped him at Fourth Avenue and Seneca Street reacted by saying, “ ‘not with this you’re not,’ and he grabbed the fliers that I was holding on to and then proceeded to dig into the bag where I had the remaining fliers.... As he reached into the cloth sack, I said, ‘you need a search warrant to take those.’ .., He said, I believe — he said something to the effect of, ‘no, I don’t.’ ” His remaining fliers were seized but Stedl was not arrested. When Stedl asked the officer for his badge number, he was told to “get going.” He then left and continued to protest only outside of the zone. Stedl testified that “I was intimidated to the point that I felt that if I had returned to the no protest zone to hand out the First Amendment, that I would most likely get arrested, yeah, and that was not my intent .... ”
After many months of investigation, the Seattle City Council concluded that “Seattle was not sufficiently mindful ... of the need to create an environment protecting the rights to speech and assembly.” ARC Report at .5. The City’s policies in implementing Order No. 3 targeted expressive activity but did not seek to distinguish between violent and non-violent protestors or to better-tailor the fit between Seattle’s security problems and a legitimate solution.
II. Restrictions on Time, Place, and Manner of Speech
A. Narrow Tailoring
If a regulation restricting speech in a public forum is content neutral, our standard for determining whether it is narrowly tailored is more relaxed. Perry Education Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The policy adopted “need not be the least restrictive or least intrusive means” available to survive this intermediate level of constitutional scrutiny. Ward v. Rock Against Racism, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). But a government entity is not free to adopt any regulation that serves its interests more effectively than no regulation at all; a restriction may not burden “substantially more speech” than necessary to further the government interest at stake. Id. at 799, 109 S.Ct. 2746; see also Kuba v. 1-A Agricultural Ass’n, 387 F.3d 850, 861 (9th Cir.2004).- “A statute is narrowly tailored if it targets and eliminates no more than the exact source of the ‘evil’ it seeks to remedy.” Frisby v. Schultz, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); see also Ward, 491 U.S. at 799, 109 S.Ct. 2746 (“Government may not regulate expression in such a manner that a substantial portion of the *1167 burden on speech- does not serve to advance its goals.”). This is. so even if the rule is completely effective in eliminating the targeted evil. Id. at 799 n. 7, 109 S.Ct. 2746.
The 25 square blocks of downtown Seattle cordoned off by Order No. 3 were plainly a public forum; indeed, city streets are “quintessential public forums” which “ ‘have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.’ ” Perry Education Ass’n, 460 U.S. at 45, 103 S.Ct. 948 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)); see also ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092, 1099 (9th Cir.2003). “No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora.” Frisby, 487 U.S. at 481, 108 S.Ct. 2495.
Our inquiry into whether Order No. 3 was narrowly tailored should begin by analyzing the government’s asserted interests in responding to the violence confronting Seattle on November 30. See Kuba, 387 F.3d at 858. Without doubt, a city has a significant interest in preserving the safety of its residents and visitors, and in preventing violence and vandalism on city streets.[6] See, e.g., Perry v. Los Angeles Police Dep't, 121 F.3d 1365, 1369 (9th Cir.1997) (“Government interests in promoting public safety and the orderly movement of pedestrians, and in protecting the local merchant economy are ... substantial.”). A city cannot, however, use a coneededly-legitimate interest in “security” to justify a rule drawn as broadly as it wishes. See Bl(a)ck Tea Soc’y v. City of Boston, 378 F.3d 8, 13 (1st Cir.2004) (“Security is not a talisman that the government may invoke to justify any burden on speech (no matter how oppressive).” (emphasis in original)). Here, Klotz’s declaration suggests, “[t]he City’s goal should have been to transport *1168 the delegates to the conference, not necessarily to protect a particular method of getting them to the conference (walking individually, without any designated route).” Viewing the City’s interest in this broader context,[7] it becomes clear that such a sweeping prohibition on speech as Order No.- 3 imposed was not justified.[8]
Like a hypothetical ban on handbilling, see Ward, 491 U.S. at 799 n. 7, 109 S.Ct. 2746, Seattle’s ban on all protesting within a large area of downtown Seattle might have effectively quelled violence and improved safety. Nonetheless, because it “burden[ed] substantially more speech than [was] necessary to further the government’s legitimate interests[,]” Kuba, 387 F.3d at 861, Order No. 3 was not narrowly tailored. The City’s solution was a poor fit in several respects.
First, Order No. 3 was geographically larger than justified.[9] Protestors were banned from a 25-square-block area of downtown Seattle that purposely encompassed every place they could hope to communicate to delegates.[10] Mayor Schell testified in his deposition that he never scrutinized or questioned why the zone needed to be that large — simply, “the concept was to enclose all of the delegate hotels.” But as Klotz pointed out, the size of the No Protest Zone actually impeded law enforcement anywhere other than the perimeter, since “[i]t takes more officers to secure a larger space than a smaller one.” The majority cites no case in which a court has upheld a similarly-large prohibition; in fact, we have struck down restricted zones of much smaller scale.[11]
*1169 Second, the Order banned all protesting without regard to the likelihood that it would lead to violence or disorder. Not only that, but any individual intent on causing harm could easily enter the zone simply by asserting that he or she fell within one of the Operations Order’s exceptions. Order No. 3 banned peaceful expressive activity without regard to the City’s stated safety-related goals. The majority concludes that it would have been too burdensome to require police to make case-by-case distinctions between “those protestors with benign intentions and those with violent intentions.” Maj. op. at 1134 (citing Hill, 530 U.S. at 729, 120 S.Ct. 2480). This case is significantly different from Hill: the police established a perimeter around the No Protest Zone precisely so they could make case-by-case determinations as to who would be allowed in the restricted area. The majority would allow the police to search people they suspected of carrying stickers and handbills, but concludes that it “would not have been practical” for police to search for crowbars or spray paint. Id. at 1135. I see no basis for that conclusion.
In Collins, we evaluated a similar emergency order adopted under analogous circumstances.[12] After the verdict was announced in the first Rodney King beating trial, San Francisco found itself amidst a number of demonstrations — both peaceful and violent. 110 F.3d at 1367. Those demonstrations led to “a number of violent incidents,” which caused property damage and minor injuries. Id. In response, then-Mayor Jordan declared a state of emergency and issued an order, approved by the Board of Supervisors, authorizing the police to disperse any gatherings “anywhere in the City and County of San Francisco whenever the peace officer on the scene has reason to believe that the gathering endangers or is likely to endanger persons or property.” Id. The order was thus specifically targeted to bar only demonstrations that would likely lead to violence. We nonetheless held not only that the order was facially unconstitutional, but that the law was so clearly established than no reasonable officer could believe it would be constitutional. Id. at 1374.
In making that determination, we noted that “the proper response to potential and actual violence is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure.” Id. at 1372. Similarly, in Baugh, we noted that “[t]he Park Service, in lieu of restraining the expressive activity by refusing to issue the permit, should have issued the permit for the lawful expressive activity and then arrested the demonstrators if and when they tres *1170 passed.” 187 F.3d at 1044. The plaintiffs here argue that “police should have had more extensive staffing on the street so that they could permit protestors to enter anywhere and simply arrest and remove those who violated the law.” Maj. op. at 1135. Yet in the face of our clear precedent, the majority asserts “we should hesitate to say that the law requires such a solution” where a city confronts actual lawbreakers. Id. at 1135. That hesitation is plainly contrary to our circuit’s law.
Third, even those who were exempt under the plain terms of the Order were denied entry if they displayed any visible signs, stickers, or messages related to the WTO. The City’s policy was clear: protesting was not a “legitimate purpose” for entering the No Protest Zone. This restriction cannot survive constitutional scrutiny. In Virginia v. Hicks, the state housing authority similarly attempted to ban “any person” from the streets of a public low-income housing development “when such person is not a resident, employee, or such person cannot demonstrate a legitimate business or social purpose for being on the premises.” 539 U.S. 113, 116, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (emphasis in original). Again like here, the policy was enacted “in an effort to combat the rampant crime” that had infected the area. Id. at 115, 123 S.Ct. 2191. The Supreme Court upheld the policy under the First Amendment only after interpreting “legitimate business” to include expressive activity. Id. at 122, 123 S.Ct. 2191; see also Hodgkins v. Peterson, 355 F.3d 1048, 1059 (7th Cir.2004). Seattle’s clear policy of excluding any form of protest from its definition of “legitimate purposes” disregards the primacy we afford such core political speech under the First Amendment.
We considered a similar problem in Grossman v. City of Portland, where we invalidated a law forbidding organized demonstrations in a public park without a permit.[13] 33 F.3d 1200, 1203 (9th Cir.1994). Like Seattle’s interpretation of Order No. 3, whether an individual was subject to arrest under the statute depended entirely on whether that individual was displaying a message.
Consider this: if [the plaintiff] and his companions had been standing in a group in the park after meeting unexpectedly, and had been discussing gardening, or the Portland Trailblazers, the [plaintiff] would not have been arrested. While the addition of signs — or T-shirts, or an “address” — would have occasioned the application of [the challenged ordinance], the distinctions are absolutely empty in terms of the ordinance’s stated goals.
Id. at 1207. Order No. 3 operated in exactly the same way, and we should not condone that affront to First Amendment protections.
The majority’s conclusion to the contrary is plainly wrong. Finding Grossman “inapposite,” the majority states that Seattle’s “distinction between groups displaying messages and groups not displaying messages” was appropriate because protestors — and “not emergency personnel, *1171 business employees, or shoppers” — caused the violence. Maj. op. at 1137 n. 46. The majority, however, overlooks two important points: First, a distinction between protestors and non-protestors was not at the heart of Order No. 3. The Order instead aimed to preserve the public safety by implementing a limited curfew, which would alleviate the disorder and chaos in the downtown area. See id. at 18-19 (quoting Order No. 3 pmbl). But the majority is also wrong as a factual matter. People within the zone (including employees and shoppers) who simply displayed messages were no more likely to cause violence than those without messages. See id. at 15 (describing an incident where a delegate, not a protestor, drew a gun against the crowd). Whether or not an individual wore a “No WTO” button should have had no bearing on her treatment by the police.
Fourth, the Order completely disregarded any interest in maintaining peace and security in areas outside the zone. While the Order may-have served to protect delegates, it did not protect anyone outside of the perimeter. “[Pjolice operations ... should convey a perception of even-handed commitment to protecting demonstrators as well as the larger public[;]” the City’s response to the demonstrations in Seattle did not serve that goal. ARC Report at 4. The majority recognizes the poor fit between the City’s asserted interests and the means it chose to respond to the violence:
Even outside the restricted zone, there were some problems of violence incidental to protest. Some violent protestors caused property damage, threw debris, blocked the street, and trapped people in their cars. Some protestors jumped onto an officer’s patrol car and shook it by its light bar, while others laid in front of the car and prevented the officer from escaping. Some protestors took over the fuel pumps at a gas station and attempted to fill small bottles with gasoline.
Maj. op. at 1126 n. 21. The majority acknowledges that a Seattle police captain’s report “noted that officers ‘heard and saw numerous incidents of property destruction, burglary, and looting; but we were unable to leave our lines to take enforcement actions.’ ” Id. at 1124. The large perimeter created by Order No. 3 could only be maintained by a substantial police presence; its size thereby allowed the violence in areas outside the No Protest Zone to continue. The perimeter in fact served only the- goal of protecting WTO delegates. It therefore violated Ward’s requirement that “[t]he tailoring of the restraint must of course correspond to the purposes it serves.” Id. at 1131 (citing Ward, 491 U.S. at 799, 109 S.Ct. 2746).
Finally, and fundamentally, Order No. 3 was not narrowly tailored to the City’s interests because, as Klotz put it, “it was sought to pursue the wrong goal.... ” That is, the Order guaranteed that WTO delegates could walk safely from their hotels to the Convention Center on city sidewalks. But as noted above,[14] the City’s significant interest was not so narrow; the City had less-restrictive alternatives available that would have served its interest in safety and security equally well. We have stated that “while the City need not employ the least restrictive alternative in promoting its interest in public safety, ‘if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the “fit” between ends and means is reasonable.’ ” Edwards v. City of Coeur d’Alene, 262 F.3d 856, 865 (9th Cir.2001) (quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 418 n. 13, 113 *1172 S.Ct. 1505, 123 L.Ed.2d 99 (1993)) (alteration in original). Here, the plaintiffs suggested several.
The majority concludes that because Seattle’s pedestrian “tunnels ... did not connect all of the hotels and venues being used by WTO delegates[,]” the plaintiffs’ suggestions were not “feasible.” Maj. op. at 1134 n. 39. Even assuming the pedestrian tunnels were an inadequate solution, the plaintiffs in fact suggested various other worthwhile alternatives. First and foremost, “the City should have developed a plan to ensure that delegates could get to the convention.” As Assistant Police Chief Clark Kimerer explained in his declaration, the City was aware that “[a]n avowed and announced goal of some of the protestors was to shut down the WTO convention, i.e., prevent the delegates from reaching their venuesf;]” therefore, transportation should have been an important part of the City’s response.[15] Klotz suggested, for example, “planned bus and van service routes or controlled access routes” for the delegates; instead, “the only transportation option for delegates was to walk from their various hotels to [the] Convention Center through routes of their own choosing.” Klotz suggested several concrete alternatives:
A dedicated drive called Convention Way runs underneath the Convention Center from approximately Ninth and Pike to Seventh and Union. It is designed to accommodate tour busses and has an easily protected indoor entrance to the facility.... Thus, one transportation method that should have been explored was sending buses from the hotels out to the Interstate, and into the Convention Center through this entrance. This route is indirect, but it avoids almost all protest points.
Another transportation option that I did not see explored is the pedestrian tunnel that runs from the Rainier Square building ... and exiting only a few yards from a well protected off-street entrance to the Convention Center. Mayor Schell testified in his deposition that he used this route without incident on the afternoon of November 30.
Further, the City could have used “flying squads,” or mobile teams without responsibility for maintaining police lines, that could have pursued and arrested vandals and violent protestors. Although the City originally planned on pursuing this strategy, “[w]hen the day arrived, the flying squads were pulled off that duty to join the fixed police lines. As a result, the relatively small number of vandals could destroy property without threat of arrest.” Lieutenant Neil Low, who was responsible for deploying flying squads, stated in his internal WTO After Action report that “[i]n concept, we were to work along with Lt. Joe Kessler’s plain-clothes squad in locating and arresting hardcore protestors committing criminal acts. In actuality, we became involved in crowd control within one hour of being on the street, continuing with that for the remainder of the week.”
“[T]he First Amendment demands that municipalities provide ‘tangible evidence’ that speech-restrictive regulations are ‘necessary’ to advance the proffered interest in public safety.” Edwards, 262 F.3d at 863. As this list of alternative possibilities demonstrates, Order No. 3, as written, was not necessary to advance that interest, *1173 nor did the City provide any tangible evidence of such a requirement. The Order was not narrowly tailored and the majority’s contrary conclusion disregards these important considerations.
B. Ample Alternatives
Not only was Order No. 3 not narrowly tailored to serve the significant government interest in safety and security, it also failed to leave open ample alternative methods of communication. An entire medium of speech was foreclosed and the WTO protestors were silenced and relegated to the sidelines. “If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication.” Id. at 866 (citing Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 654, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)); see also Bay Area Peace Navy, 914 F.2d at 1229 (“An alternative is not ample if the speaker is not permitted to reach the ‘intended audience.’ ”). Order No. 3 prevented protestors from entering the 25-square block area where WTO delegates could see and hear them. It confined all demonstrations to outside areas where the message the protestors sought to convey may never have reached the intended audience.[16]
In Bay Area Peace Navy, we found that a 75-yard security zone “rendered the [plaintiffs’] ... demonstration completely ineffective and that passing out pamphlets on land or demonstrating at the entrance to the pier are not viable alternatives because the invited visitors, who are the [plaintiffs’] intended audience, are not accessible from those positions.” 914 F.2d at 1229 (quotation marks omitted). And in Baugh, we held that forcing demonstrators to an area 150 to 175 yards away from their intended audience “[did] not provide a reasonable alternative means for communication of [the plaintiffs’] views.” 187 F.3d at 1044. Because the regulation at issue in Baugh was not tailored “narrowly to allow for lawful demonstrations,” it did not leave open ample alternative means of communication. Id. Similarly, Order No. 3, which forced protestors to the sidelines and back entrances to the WTO conference venues, did not provide viable alternatives.
City officials all but conceded that the avenues of expression left open were insufficient to allow for meaningful communication. Before the conference began, Seattle police negotiated with organized protest groups to set up “established protest areas.” As Assistant Chief Joiner testified,
In establishing those sites we had tried to make sure that they were well located or that they met the needs of the protest *1174 groups, that they were visible, that they could see whatever event that they were protesting. In other words, they would be located very close to them. And so we had tried to do everything we could to accommodate peaceful protests on the front side. Obviously that — those agreements broke down on Tuesday morning.
After the agreements broke down and the Mayor issued Order No. 3, Joiner explained that “we had to move people out of that area.” In other words, the carefully-crafted protest areas, which would have allowed protestors to see the delegates and be seen by them, were eliminated. Instead, protestors were relegated to the inaccessible areas where no WTO delegates would be bothered by their presence.
Without citing any authority, the majority concludes that the ample alternatives test should be applied “with a practical recognition of the dire facts confronting the City....” Maj. op. at 1140. Nowhere in our case law, however, have we even suggested that courts should balance this factor against a city’s asserted need to restrict speech. Rather, we require that ample alternative avenues of expression be available in order for a time, place, and manner restriction to withstand First Amendment scrutiny. There is no exception for exigency.
The City asks us to adopt the rule advocated by the Second Circuit in Bl(a)ck Tea Society. There, the court noted that demonstrators’ messages at “a high-profile event” — the 2004 Democratic National Convention — may reach delegates even if speech is curtailed, “through television, radio, the press, the internet, and other outlets.” 378 F.3d at 14. Because the majority concludes that the ample alternatives requirement was met in any event, it does not address this argument. Maj. op. at 1139 n. 49. The district court, however, relied on this argument to conclude that Order No. 3 did not foreclose reasonable alternative avenues of expression. The district court was mistaken and we should dispel any notion that media interest in an event can be a substitute for constitutionally-required alternative avenues of communication. As the Seventh Circuit stated in Hodgkins, “there is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person.... ” 355 F.3d at 1063. Public protests are at the heart of the First Amendment and are critical for incubating civic engagement and encouraging spirited debate.
We evoked this concern in Grossman, 33 F.3d at 1205 n. 8, and reiterated the particular importance of preserving parks as forums for public debate precisely because ordinary people lack reliable access to the media. The need to protect the average citizen’s ability to be heard “is increasingly significant now, when the extremely rich have an enormous variety of privately-owned media through which to reach the public.... At present, more democratic means of communication — demonstrations in parks, bumper stickers, signs in the windows of homes — must be jealously protected.” Id. The City would place the demonstrators at the mercy of the media industry. There is no way to guarantee that the message protestors seek to convey would be heard in any recognizable format. The First Amendment cannot allow a city to require that subjugation.
C. Discretion
Even a content-neutral time, place, and manner restriction will not survive First Amendment scrutiny if it allows for unduly broad discretion on the part of the official charged with enforcing the regulation. Thus, a regulation that restricts speech must “contain adequate standards to guide the official’s decision and render it subject to effective judicial review.” Thomas v. *1175 Chicago Park District, 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). This rule applies even outside the traditional context of licensing schemes. For example, in Board of Airport Commissioners v. Jews for Jesus, the Supreme Court held unconstitutional a city ordinance that prohibited all “First Amendment Activities” at Los Angeles International Airport, even if the law were read to apply only to expressive activity that was not “airport-related.” 482 U.S. 569, 575, 576, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). The Court refused to validate a law that would
give LAX officials alone the power to decide in the first instance whether a given activity is airport related. Such a law that confers on police a virtually unrestrained power to arrest and charge persons with a violation of the resolution is unconstitutional because the opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.
Id. (quotation marks omitted).
The First Amendment forbids even the opportunity for abuse, not just policies that encourage preference for a favored view. See City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). If that opportunity is present, the regulation “ ‘creates an unacceptable risk of the suppression of ideas.’ ” Kuba, 387 F.3d at 856 (quoting Foti v. City of Menlo Park, 146 F.3d 629 (9th Cir.1998)). Order No. 3, however, clearly afforded officers the opportunity for abuse, and was therefore constitutionally infirm.[17] According to Mayor Schell’s deposition testimony, the decision whether to arrest peaceful, lawful protestors within the zone “would depend on the judgment of the officers and people charged with the responsibility of carrying out that order.”
Chief Stamper acknowledged that Order No. 3 and the Operations Order interpreting it were “sufficiently vague that it made it difficult from a working cop’s point of view to distinguish between who should and who should not be left out.” Stamper himself “honestly [didn’t] know the answer” whether peaceful protest was a “reasonable purpose” under the Order. And Officer Smith testified at his deposition that he and his fellow officers were never given “a laundry list of activities which would be deemed to be legitimate.” Instead, he was told simply to apply “what a reasonable person would think legitimate business is.” In sum, the plaintiffs presented evidence that individuals with disfavored views — namely, anyone wearing a “No WTO” sticker or button — were systematically excluded from the zone, whether or not the individual should have been allowed entry under an exception to the Order.[18] Furthermore, officers were per *1176 mitted complete discretion to determine who was a “protestor” and what was a “reasonable purpose,” and therefore who would be excluded. The majority’s conclusion that “there was no danger on the face of Order No. 3 that officers enforcing the restricted zone could indiscriminately withhold permission to speak,” maj. op. at 1145, is flatly contrary to the evidence.
The majority concludes that under Chicago Park District, the guidelines contained in the Operations Order were sufficiently “specific and objective, and [did] not leave the decision to the whim of the administrator.” Id. at 1146 (quoting 534 U.S. at 324, 122 S.Ct. 775). But the discretion provided here is quite different— and clearly broader — than the ordinance upheld in Chicago Park District. That case involved a licensing scheme that allowed the district to deny a permit
when the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on pri- or occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would present an unreasonable danger to the health or safety of park users or Park District employees; or when the applicant has violated the terms of a prior permit.
534 U.S. at 324, 122 S.Ct. 775. In light of these highly objective criteria, the Supreme Court held that the disqualifying grounds were “reasonably specific and objective” to defeat a claim of unbridled discretion. Id. The Court has never held that a regulation allowing officers to determine unilaterally what constitutes a “reasonable purpose,” with no further elaboration on what might be considered “other like type reasonable activity,” provides sufficient guidance.[19] Even if Order No. 3 were in fact a reasonable time, place, and manner restriction, it would nonetheless fail to satisfy the First Amendment’s requirements foreclosing unbridled discretion in enforcement.[20]
III.
As for Menotti, Stedl, and Skove’s Fourth Amendment claims, I would reverse the district court’s grant of summary judgment. I agree that Menotti has presented sufficient evidence to create a material factual dispute whether he impeded pedestrians and whether he obstructed an officer in the performance of his duties. Whether the police officers had probable cause to arrest Menotti turns on the reso *1177 lution of these factual issues. See, e.g., United States v. Valencia, 24 F.3d 1106, 1108 (9th Cir.1994). I would also reverse the district court’s summary judgment ruling against Stedl, because there is sufficient evidence in the record to create a genuine factual dispute whether the City had a policy of authorizing unlawful searches and seizures of those who sought to express any opposition to the WTO. See Oklahoma City v. Tuttle, 471 U.S. 808, 817, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Finally, I agree with the majority that Skove has alleged a violation of his Fourth Amendment rights and defendant Smith is not entitled to qualified immunity.
& Hí & &
Because Order No. 3 was not narrowly tailored, did not leave open ample alternative means of communication, and afforded individual officers unbridled discretion in its enforcement, it is facially unconstitutional. I would therefore reverse the district court’s grant of summary judgment against all Rankin plaintiffs, cf. maj. o-p. at 1149 n. 67, and against Menotti, Sellman and Skove on their First Amendment claims. I would also reverse the district court’s summary judgment against Menotti, Stedl, and Skove as to their Fourth Amendment claims.

. According to Assistant Seattle Police Chief Harvey Ferguson, "that was the term that was being used” until "word came out ... that was an inappropriate term” and the name was changed to "restricted zone.” As I explain in Part I.B., below, the City’s policy was to keep this area protest-free. City officials, police, and demonstrators all used the term "No Protest Zone” to refer to the area, and therefore I use that term throughout this dissenting opinion.

. Because I would hold that Order No. 3 is constitutionally invalid, I would reverse the district court’s adverse ruling as to Thomas Sellman and remand for further proceedings. I therefore dissent from Part IV.B. As I explain in more detail in Part III, infra, I concur in Parts IV.A and D of the majority opinion that Victor Menotti and Doug Skove have presented sufficient evidence to create material factual disputes for trial. I dissent, however from Part IV. C, affirming the summary judgment ruling against Todd Stedl.

. The majority states that "[t]he whole world witnessed the rampant violence and chaos in the streets of Seattle at the outset of the WTO meeting.” Maj. op. at 1120 n. 7. But as the Seattle City Council suggested, those images may not have accurately reflected the situation in Seattle, as peaceful political demon *1160 strators "were drowned out by press coverage of disturbances.” ARC Report at 4.

. The majority's warning that ”[e]ven a fierce battle may experience a respite of calm, and the calm of an evening can precede a storm in the morning[,]” maj. op. at 1131 n. 33, is alarmism supported by neither the evidence nor the law. The fact that violence had ended and Seattle’s streets were calm when the Mayor issued the Order is undisputed in the record. Nonetheless, the majority provides the City "reason to believe ... that the violence attendant to the WTO conference had not ended prior to Order No. 3's enactment, but had just temporarily subsided and would resume contemporaneous with WTO proceedings.” Id. at 45 n. 44. At the summary judgment stage, however, we must view the evidence in the light most favorable to the nonmoving party. Balint v. Carson City, 180 *1161 F.3d 1047, 1054 (9th Cir.1999) (en banc). Only by viewing the evidence in the light most favorable to the City can the majority conclude that the violence had "temporarily subsided." With this improper factual determination, the majority sidesteps binding circuit law, which holds that "the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter).” Collins v. Jordan, 110 F.3d 1363, 1372 (9th Cir.1996).

. The videotape shows Smith approaching Skove and asking, "What did the Mayor tell you? Okay? Other side of Fourth, other side of Seneca, right?” Smith then ran toward Skove, who was crossing the street, and grabbed his sign out of his hands. As previously noted, however, on the City’s motion for summary judgment, we take the evidence in the light most favorable to the plaintiffs and therefore credit Skove’s recollection of the event. Balint, 180 F.3d at 1054.

. The majority’s assessment of the City’s significant interests is confused and inconsistent, and changes subtly depending upon the argument the majority seeks to bolster. At times, the majority cites "the core interest” as protecting the president and foreign dignitaries. See maj. op. at 1134-35 n.41. But it also claims that the City’s interest was in "maintaining public order,” id. at 1131, "providing security to the core downtown area,” id. at 1131 n. 32, and "seeing that the WTO delegates had the opportunity to conduct their business,” id. at 1132.
In my view, the City had a significant interest in protecting the public safety. That broad interest required that the City protect the public (including President Clinton and foreign dignitaries) both inside and outside the No Protest Zone, and provide safe transport for delegates to and from the convention. Order No. 3 helped serve those interests, but it was a sledge-hammer solution 'where a more tailored response would have preserved First Amendment protections. Moreover, the City did not have a constitutionally significant interest in sheltering delegates from the unpleasantness or inconvenience of a large demonstration. The Order itself was justified by a need “to protect the public peace, safety, and welfare” and to preserve the safety of "delegates, dignitaries, citizens, public safety employees and protestors” alike.
The City now argues, relying on Hill v. Colorado, 530 U.S. 703, 718, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), that it had a significant interest in protecting the delegates' "right to be left alone.” In Hill, the Supreme Court upheld a law that prohibited any person from knowingly approaching within 8 feet of another person to protest, within designated areas near medical facilities. Id. But in Kuba, we clarified that Hill "did not 'protect a potential listener from hearing a particular message,' but only 'from the potential physical and emotional harm suffered when an unwelcome individual delivers a message by physically approaching an individual at close range.' " 387 F.3d at 861 n. 10 (quoting Hill, 530 U.S. at 718-19 n. 25, 120 S.Ct. 2480). As in Kuba, the audience here was not "particularly vulnerable,” id., and therefore did not need "to be left alone.”

. The majority mischaracterizes my assessment of the City's interest as one more narrow than the situation required. Maj. op. at 1131 n. 33. That is inaccurate. The City's significant interest in safely transporting delegates to the convention sites is certainly broader than the interest Order No. 3 actually served: "to protect a particular method of getting [delegates] to the conference....” The vast size of the zone was only crucial to that more narrow interest. C.f. maj. op. at 1134. The majority recognizes that the City had an interest in "ensuring safe transit for delegates between venues and hotels," id., but offers no convincing rationale for rejecting the plaintiffs’ less-restrictive alternatives.

. The majority further maintains that “[t]he City also had an interest in seeing that the WTO delegates had the opportunity to conduct their business at the chosen venue for the conference; a city that failed to achieve this interest would not soon have the chance to host another important international meeting.” Maj. op. at 1131. I am not convinced that a city’s interest in hosting such an event is "significant” for purposes of this analysis. Because it is not asserted as an interest on appeal, we should not provide this justification for the City.

. Order No. 3 also lasted longer than necessary. The City had the right to "act vigorously, and more extensively, to restore order,” maj. op. at 1137, but as noted above, order already had been restored. See supra at 1160-61 & n. 4. The Mayor signed Order No. 3 in the early morning hours of December 1, long after both violence and protest activity had subsided. See maj. op. at 1124. Again, as we stated in Collins, 110 F.3d at 1372, "the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter).”

. The size of the No Protest Zone was reduced considerably on December 2. The new zone excluded the Westin Hotel after President Bill Clinton departed Seattle. Maj. op. at 1158, see also Appendix B.

. See, e.g., Bay Area Peace Navy v. United States, 914 F.2d 1224, 1227 (9th Cir.1990) (holding that a 75-yard buffer zone surrounding naval ships in a parade, which the city claimed served its interest in safety and security, was too large and a 25-yard zone would serve that interest just as effectively); United States v. Baugh, 187 F.3d 1037, 1044 (9th Cir.1999) (holding that a 150 to 175-yard restriction on protestors from the entrance of a visitor center was too far); Kuba, 387 F.3d *1169 at 862 (holding that a policy "which relegates communication activity to three small, fairly peripheral areas" was too broad in relation to the government's interest).

. The majority is too quick to dismiss and marginalize Collins. By asserting that the violence confronting Seattle was worse than the violence San Francisco faced, the majority concludes that Collins is simply "inapposite.” Maj. op. at 1136. But the majority’s analysis of Collins focuses on the factors it finds favorable and ignores other important distinctions that ought to inform our judgment. For example, the majority characterizes San Francisco’s emergency order as “significantly broader," id. at 1136 n. 45, dismissing the fact that the order was narrowly targeted to apply only to gatherings "likely to endanger persons or property.” The circumstances in Seattle were clearly analogous to Collins and the majority is far too eager to sidestep binding circuit law.
Moreover, the constitutional narrow tailoring analysis accounts for violence as part of the City’s interest weighed against its tailored response. I decline to adopt the majority’s approach that allows the legal framework to be shaped and distorted by its characterization of the level of violence.

. Again, the majority dismisses Grossman by distinguishing the level of violence facing the City. But the legal framework is not altered by an assessment of the City's interest as more or less important; the extent of the City's interest is accounted for inherently within the narrow tailoring inquiry. See supra note 12. Although the facts in Grossman clearly differ in certain respects from the facts at issue here, that does not render its reasoning inapplicable to this context. Indeed, where the majority finds it useful to rely on cases involving minimal violence, the majority freely relies on such authority. See, e.g., maj. op. at 1134 (discussing Hill, 530 U.S. at 729, 120 S.Ct. 2480); id. at 1138-39 (citing Bl(a)ck Tea Soc'y, 378 F.3d at 14).

. See supra note 7.

. Contrary to the majority's assertion, I do not "attempt to reduce the City's interest to transporting delegates....” Maj. op. at 1131 n. 32. The City’s interest extended to protecting the public safety broadly. But as this discussion demonstrates, the measures employed by the City served a much narrower interest and thus were not narrowly tailored. This list of alternative measures simply demonstrates that fact.

. The majority points out that the record is “void of evidence” that protestors could not be seen or heard by delegates within the No Protest Zone. Maj. op. at 1141 n. 54. But neither does the record reflect that the delegates could see and hear protestors, or that the alternative means of communication available to the protestors were sufficient. Since it is unclear whether the message could be heard in any recognizable form, at a minimum the plaintiffs have established a genuine issue of material fact such that summary judgment is inappropriate. Balint, 180 F.3d at 1054. The majority states that "the undisputed facts in the record show that per the terms of Order No. 3 protestors could communicate their views directly outside most of the hotels where delegates were staying.” Maj. op. at 1141 n.54. I am at a loss to find any evidence in the record to support that statement; nothing in the record or in the majority opinion supports the conclusion that protestors could "communicate” anything to delegates within the No Protest Zone. The majority supports its factual assertion by drawing inferences in favor of the City. As previously noted, this is improper at the summary judgment stage. I am not prepared on this limited record to conclude as a matter of law that Order No. 3 left ample alternative avenues' of expression.

. Relying on United States v. Griefen, 200 F.3d 1256, 1263 (9th Cir.2000), the majority concludes that, because Order No. 3 was a lawful time, place, and manner restriction, the discretion it afforded officers to allow or deny entry into the zone "does not render Order No. 3 constitutionally deficient.” Maj. op. at 1144. Griefen, in which we upheld the closure of a construction site to all but essential personnel, is inapposite, as the area into which the plaintiffs sought entry to protest had temporarily lost its status of public forum as a result of the construction activity. 200 F.3d at 1261 ("The immediate area of a construction zone is not an area that has the attributes of a public forum, or even a limited public forum, where people are entitled to exercise their rights of free speech.”). The 25-block area in Seattle cordoned off by Order No. 3, on the other hand, affected a quintessentially public forum-city streets and sidewalks — and therefore the Order is subject to a higher degree of scrutiny. See supra at 1166-67; see also Collins, 110 F.3d at 1371; ACLU of Nevada, 333 F.3d at 1098 ("The ability to restrict speech in public forums ... is 'sharply circumscribed.' ”).

. See supra Part I.

. Relying on S. Oregon Barter Fair v. Jackson County, 372 F.3d 1128, 1139-41 (9th Cir.2004), the majority suggests that we have in fact found sufficient guidance in similarly-drafted statutes. Maj. op. at 1144-45. But clearly the determination of "a fee reasonably calculated to reimburse the county for its reasonable and necessary costs,” S. Oregon Barter Fair, 372 F.3d at 1140, vests far less discretion in the enforcement officer than determining what constitutes "other like type reasonable activity.” The majority's attempt to equate the two is not persuasive.

. While noting the relevant facts, the majority concludes that they give rise only to a challenge to Order No. 3 as applied to particular plaintiffs. See maj. op. at 1144-46. The discretion conferred by Order No. 3, however, rendered it facially unconstitutional, Chicago Park District, 534 U.S. at 323, 122 S.Ct. 775, and incapable of any valid application. Kuba, 387 F.3d at 856. In Chicago Park District, the Court limited plaintiffs to an as-applied challenge only after determining that the challenged permitting scheme contained "adequate standards to guide the official's decision and render it subject to effective judicial review.” 534 U.S. at 323, 122 S.Ct. 775. Because the standards provided police officers to guide enforcement of Order No. 3 were not "reasonably specific and objective,” id. at 324, 122 S.Ct. 775, the majority incorrectly confines the plaintiffs to an as-applied challenge here. Maj. op. at 1148-49.